# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RICKY JOE GENNOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00478** |
| | ) | **Judge Aleta A. Trauger** |
| **RUSSELL WASHBURN, Warden,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 89) filed by defendants Sheena Pickett, Yolanda Pittman, Kendras Reed, Scottie Roach, and Russell Washburn.[1] For the reasons set forth herein, the motion will be granted in part and denied in part. In addition, the plaintiff will be directed to show cause why the claims against defendant Joseph Garland should not be dismissed without prejudice.[2]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Ricky Joe Gennoe is a prisoner in the custody of the state of Tennessee. He was incarcerated at the Trousdale Turner Correctional Center ("TTCC") from January 2019 to June

---

[1] The moving defendants are the only remaining defendants in this case who have been properly served and have entered an appearance. The parties stipulated to the dismissal without prejudice of the claims against two additional defendants identified in the Complaint and Amended Complaint, Chris Brun and Scott Schuch. (*See* Doc. Nos. 84, 85.)

[2] The plaintiff has never succeeded in locating or effecting service of process upon defendant Garland. In a Status Report filed on May 13, 2020, counsel for the plaintiff notified the court that they had made multiple attempts to locate and serve this defendant but, as of that date, had no "promising leads regarding Defendant Garland's whereabouts" and did not believe they would "be able to serve Defendant Garland in the near future." (Doc. No. 47, at 1–2.)

2019. TTCC is a prison operated by CoreCivic, Inc., pursuant to a contract with the Tennessee Department of Correction ("TDOC"). All of the defendants are, or were previously, employed by CoreCivic of Tennessee, LLC (collectively with CoreCivic, Inc., "CoreCivic") and worked at TTCC during the relevant timeframe. Specifically, Sheena Pickett was employed as a mental health coordinator and as TTCC's Prison Rape Elimination Act ("PREA") coordinator; Yolanda Pittman was Assistant Warden; Kendras Reed served as a mental health specialist; Scottie Roach was a sergeant assigned to the segregation unit where Gennoe was housed during the relevant time; and Russell Washburn was TTCC Warden.

In February 2019, Gennoe was housed in segregation. (Gennoe Dep. 32.[3]) Gennoe explained that he told prison authorities that he believed his life was in danger because of threats he had received from other inmates, but, instead of being placed in protective custody, he was written up for "refusing cell assignment." (Gennoe Dep. 32–34.) Prior to February 5, 2019, Gennoe had been housed with a cellmate, Cody Binkley, for five to seven days and had had no issues with him and had not complained about him to any correctional officers at TTCC. (Gennoe Dep. 45, 46.)

However, on the night of February 4, 2019, Binkley gave Gennoe what Binkley said was a sleeping pill, because Gennoe was having trouble sleeping. (Gennoe Decl., Doc. No. 96-1 ¶ 3; Gennoe Dep. 47–48.) Gennoe claims that, in the early morning hours of February 5, 2019, he "woke up to a sharp pain in [his] rectum and realized that [he] was being raped by Mr. Binkley." (Doc. No. 96-1 ¶ 4; *see also* Gennoe Dep. 47.) He claims that he knew he had been sexually assaulted because he "felt the penetration." (Gennoe Dep. 47.) He rated the pain he was

---

[3] Both parties filed excerpts of Gennoe's deposition, large portions of which are duplicative. These excerpts are in the record at Doc. Nos. 92-1 and 96-2.

experiencing as a ten on a scale of one to ten. (Gennoe Dep. 49.) When he woke up, he was still "drowsy" and "loopy," but he said to Binkley, "What the fuck are you doing?" (Gennoe Dep. 51.) Binkley told him, "I thought you wanted it." (Gennoe Dep. 51.) Gennoe made it clear that he did not and told Binkley to go back to his own bunk and stay there. (Gennoe Dep. 50, 52.) Binkley apologized, saying he was sorry and thought Gennoe had "wanted it." (Gennoe Dep. 50.) Immediately following the assault, Gennoe was bleeding from the rectum and experiencing severe pain. The pain and bleeding lasted a week or two. (Doc. No. 96-1 ¶ 6; Gennoe Dep. 75.)

Later that day, around 8:00 a.m., Gennoe slipped a note to Sergeant Scottie Roach, telling him that he had been sexually assaulted and needed Roach to bring him the telephone so he could report the assault in accordance with PREA requirements or for Roach to report it himself. (Gennoe Dep. 55, 61.) Roach was the sergeant over the segregation unit at the time. (Gennoe Dep. 55.) According to Gennoe, Roach looked at the note, "stuck it in his pocket and walked off." (Gennoe Dep. 59.) Later that day, or perhaps the next day, Gennoe got Roach's attention to ask him if he had done what Gennoe had asked. Roach made an "obscene gesture" in response. (Gennoe Dep. 59; Doc. No. 96-1, at 15.) Roach never reported the rape allegations to his supervisors, did not bring Gennoe the phone, and did not obtain medical treatment for him that day. (Gennoe Dep. 60; Doc. No. 96-1, at 15.) No one else came to talk to Gennoe that day. (Gennoe Dep. 65.) Gennoe also was not let out of his cell until two or three days later and did not shower during that time period. (Gennoe Dep. 54, 61, 62.)

Gennoe later submitted an inmate grievance against Roach for failing to report the rape and failing to ensure that Gennoe received medical attention. The grievance states:

> I would like to file a grievance again[st] Sgt. Roach for refusing to contact, or file a P.R.E.A. when I asked him to, I asked him at count when he was passing by my door, I handed him a paper that said "please call P.R.E.A. for me I have been sexually assaulted." He read it, and smiled. Later on the next day I think I said did

you take care of that Sgt. Roach, he said, what, I said are you serious. We argued a little then he made a nasty sexually based comment toward me. He just ignored me and my request for P.R.E.A. to be contacted. I was scared for my life, my celly was with a gang banger, and all types of threats were happening. Now Roach mistreats me, makes discriminatory remarks toward me, and puts my life in further danger. I even wrote and told asst. warden that he would not contact P.R.E.A. I couldn't use a phone in A.A. for weeks on weeks. I do not fee safe being in a pod that Sgt. Roach is in charge of and my attacker is still in. Please help me before I am killed, or badly, badly hurt.

(Doc. No. 96-1, at 14–15.) Although the grievance is signed by Gennoe and dated February 5, 2019, and he states in his Declaration that it was submitted that day (*see* Doc. No. 96-1 ¶ 15), the context of the written statement (for instance, the referenced to "Later on the next day I think") suggests it was actually written a few days later.

On February 6, 2019, Kendras Reed, the mental health specialist, stopped by Gennoe's cell door. (Gennoe Dep. 67; Doc. No. 96-1 ¶ 16.) According to Gennoe, Reed regularly came around and "brought puzzles." (Gennoe Dep. 68, 69.) That day, Gennoe asked Reed to pull him out of his cell so he could speak to him privately about an urgent matter. (Gennoe Dep. 71; Doc. No. 96-1 ¶ 16.) The plaintiff does not claim to have explained at that time to Reed what the urgent matter concerned, but he told him it was urgent and he was crying, so he "assumed that [Reed] would pull [him] out." (Gennoe Dep. 71, 72.) Gennoe explained that his cellmate was sitting right behind him and everyone on the unit can hear everything, so he just told Reed that the matter was "urgent." (Gennoe Dep. 71–72.) Reed responded that he was "on his way out" and would see Gennoe in "a couple of days." (Gennoe Dep. 71.) Gennoe also asked Ms. Carter, the correctional officer in his unit at the time to "go get [Reed] before he leaves," but she just "walked off." (Gennoe Dep. 72–73.) He did not tell Carter that he needed medical attention or that he wanted to make a PREA report. (Gennoe Dep. 73.)

Nothing happened on February 7, 2019. Although Gennoe saw the correctional officer who "works the pod," he did not tell him that he needed medical attention or wanted to report a sexual

assault, which he explained by stating that he was "still in the cell with the aggressor." (Gennoe Dep. 73, 74.)

On February 8, 2019, Reed was back on Gennoe's unit, and Gennoe again begged him to take him out of his cell so he could talk to him privately. (Gennoe Dep. 76.) This time, Reed had the correctional officer on the unit handcuff Gennoe and take him to Reed's office. Once there, Gennoe told Reed that he had been sexually assaulted and had been "trying to report it." (Gennoe Dep. 76.) Reed called defendant Sheena Pickett, TTCC's PREA coordinator, to relay that information. Pickett, through Reed, asked questions of the plaintiff, including whether he had showered or changed clothes since the assault. He answered that he had not. (Gennoe Dep. 77.) He also reported that he needed medical treatment, as he was still bleeding from the rectum and it hurt when he urinated. (Gennoe Dep. 78.) Pickett told Reed to tell Sergeant Roach to take Gennoe "directly to medical." (Gennoe Dep. 78.)

At that point, Reed and Gennoe walked out of Reed's office, and Reed asked the correctional officer waiting there to summon Roach, which she did. When Roach arrived, he announced that he "was doing a reclass" and did not have time to "fool with" taking the plaintiff to medical. (Gennoe Dep. 79.) Roach, however, called defendant Joseph Garland,[4] the captain on duty, notifying him that he had a prisoner who "needs to report a PREA." (Gennoe Dep. 79.) Gennoe claims that Garland arrived on the scene cursing and angry about having to report another PREA, that it was the third one that day and he did not have time to deal with it. (Gennoe Dep. 79.) When Garland reached the group standing outside Reed's office, he took Gennoe, alone, back into Reed's office and demanded to know what was going on. Gennoe told him he was bleeding

---

[4] As previously noted, this defendant has not been served or entered an appearance in this lawsuit. (*See* Note 1, *supra*.)

and needed to see medical, that he was hurting and "couldn't urinate right," and that he had been trying to report the sexual assault for three days. (Gennoe Dep. 80.) He also told Garland that Pickett had said he should be taken to medical. Garland "got up in [his] face and said [he] wasn't going to medical and [he] wasn't reporting no PREA." (Gennoe Dep. 80.)

After that, Garland told Gennoe to go stand outside the office. The plaintiff stood there with Reed and several correctional officers. The plaintiff "assum[ed]" that, while he waited outside Reed's office, Garland called Pickett back. Garland came out a few minutes later. Gennoe asked if he was being taken to medical. Over the plaintiff's protests, Garland refused to take him to medical or to make a PREA report. Even though the plaintiff told Garland that he had not showered or changed clothes since the assault, Garland told him he had eaten so there was "nothing [they] can do." (Gennoe Dep. 81–82.) He told Gennoe that he (Gennoe) was bigger than Binkley and should have "whooped his ass." (Gennoe Dep. 82.) Instead of taking Gennoe to medical, he directed that he be taken back to his cell. When Gennoe protested being put back in the same cell with Binkley, Garland told the officers to put him in the cell just below Binkley's. Gennoe again protested that he did not want to be in the same unit as Binkley, but the officers ignored him. (Gennoe Dep. 82.) In his Declaration, Gennoe states that Roach and Garland placed him back in the same housing unit in a cell that was directly below Binkley's. (Doc. No. 96-1 ¶ 17.)

Gennoe claims that, shortly after he was returned to the unit, Officer Carter told Binkley about the plaintiff's sexual assault allegations. As a result, Binkley started yelling obscenities and threats and trying to "pay people to pop out and get [him]." (Gennoe Dep. 82, 83; *see also* Doc. No. 96-1 ¶ 17.) This verbal abuse from Binkley continued basically until Gennoe was transferred to a different facility. (Gennoe Dep. 85.)

In late February, the plaintiff was moved out of segregation and into the "compound" for a few days, before being moved back into segregation for refusing cell assignment. (Gennoe Dep. 85–86.) Gennoe claims that Roach specifically instructed the officer escorting him to segregation to place Gennoe in the cell next to Binkley's. (Doc. No. 96-1 ¶ 18.) Gennoe was in this cell for a few weeks, during which he was again subjected to verbal harassment and threats from Binkley. (Doc. No. 96-1 ¶ 18.) Toward the end of April, Roach moved Gennoe to a cell just below Binkley's, still within the segregation unit, despite Gennoe's continued pleas to Roach that he not be placed near Binkley. (Doc. No. 96-1 ¶ 19.) Gennoe continued to experience threats and harassment from Binkley. Gennoe also claims that, during this same period of time, he overheard Roach, on "multiple occasions," instruct officers on the unit to refuse to provide Gennoe with meals and to shut off the water supply to his cell. The officers complied with these instructions and deprived him of meals and water. On some occasions, the "water was shut off for days at a time." (Doc. No. 96-1 ¶ 20.) Gennoe asserts that these actions by Roach were in retaliation for his filing a PREA report and a grievance against Roach.

Gennoe also alleges that, despite repeated requests, he never received a medical examination in the immediate wake of the rape. He was not evaluated until a nurse at TTCC "spoke with [him] a few weeks after the rape, at which point [his] rectal bleeding and pain had stopped." (Doc. No. 96-1 ¶ 7.) He also asserts that the assault caused him "extreme emotional distress," nightmares, insomnia, anxiety, fear, paranoia, and depression. (Doc. No. 96-1 ¶ 8.) However, he never received any kind of mental health treatment or counseling while at TTCC, despite verbally asking mental health coordinator Reed for such treatment on numerous occasions and submitting multiple sick-call requests. (Doc. No. 96-1 ¶ 9.) On the one occasion when he attempted to talk with Reed about the rape, while Reed was at the front door of his cell, Reed refused to discuss his

request for treatment or his injuries, prescribe medication, or refer him to a psychiatrist. (Doc. No. 96-1 ¶¶ 10–11.) Gennoe did not see Reed again after this exchange. (Doc. No. 96-1 ¶ 10.) Asked during his deposition why he sued Reed when it appeared, on February 8, at least, that Reed was trying to help him, the plaintiff reiterated that he repeatedly requested that Reed help him get mental health assistance and that Reed repeatedly denied his request. (Gennoe Dep. 88.) According to the plaintiff, Reed did not provide mental health treatment; instead, he brought the plaintiff puzzles several times. (Gennoe Dep. 88.)

Asked what else he would have wanted Sheena Pickett to do that she did not do, the plaintiff stated that it was her responsibility to "make sure [he] was taken to medical no matter what, screened, and investigated," but none of those things were done on February 8. (Gennoe Dep. 90.)

Regarding his claim against Warden Russell Washburn, the plaintiff also alleges that he spoke directly with the warden about his PREA complaint and unsuccessful attempts to obtain medical and mental health treatment following the sexual assault. He wrote down his allegations on an incident report, which he sent to the Warden through "the family advocate," but he also spoke to Washburn at his cell door a few days after the sexual assault and told him about the assault and his continued unaddressed need for medical attention. (Gennoe Dep. 92; *see also* Doc. No. 96-8, at 1; Doc. No. 6, at 8.) When he spoke to Washburn, the warden "took a picture of [Gennoe's] face sheet on the side of [his] door and said, 'I want to check into it.'" (Gennoe Dep. 93.) After that, the warden walked away, and the plaintiff never heard anything further from him.

The plaintiff also made a report to Assistant Warden Yolanda Pittman. (Gennoe Dep. 93.) Pittman came to his door, and he also "wrote her in-house mail and sent her [incident reports] also through the in-house mail." (Gennoe Dep. 93.) Pittman came to his door late one night and told

him to stop filing grievances and incident reports and that she was "going to get [him] shipped out of there" to another facility soon, but he "just needed to stop." (Gennoe Dep. 94.)

Meanwhile, the plaintiff also filled out numerous incident reports as well as sick-call requests, asking to see a mental health doctor. (Gennoe Dep. 96.) He handed the sick-call requests to several officers working the unit. He never did receive mental health counseling or medication related to his sexual assault claim until after he was transferred out of TTCC. Once he was transferred to a different facility, Gennoe began to receive mental health treatment and continues to receive such treatment. He has been diagnosed with depression and post-traumatic stress disorder ("PTSD") as a result of both the abuse he suffered as a child and the rape that is the genesis of this lawsuit. (Doc. No. 96-1 ¶ 14; *see also* Doc. No. 96-7, at 34–40.) He has been, and continues to be, prescribed psychotropic medications to treat his anxiety and PTSD. (Doc. No. 96-1 ¶ 14; *see also* Gennoe Dep. 100–02.)

Gennoe, proceeding *pro se*, filed his initial Complaint in this action on June 5, 2019 and the Amended Complaint on June 20, 2019, articulating claims against each of the named defendants in their individual capacities under 42 U.S.C. § 1983. As indicated, Gennoe's claims are based upon the defendants' refusal to provide necessary medical and mental health treatment, in violation of his rights under the Eighth and Fourteenth Amendments. He also claims that Roach and Garland retaliated against him for exercising rights protected by the First Amendment. Because Gennoe is a prisoner who proceeds *in forma pauperis*, the court conducted an initial review of the Complaint, as amended, and found that the plaintiff stated colorable claims.[5]

---

[5] The plaintiff also asserted that the defendants violated the PREA by refusing to properly report and investigate his sexual assault claim. The court found, however, that, to the extent the plaintiff was attempting to state a claim based on a violation of his rights under "PREA laws and guidelines," such a claim was subject to dismissal, because violations of the PREA may not be redressed through a private suit, under § 1983 or otherwise. (Doc. No. 9, at 10–11.)

The undersigned reserved ruling on the plaintiff's then-pending Motion to Appoint Counsel, finding that the Magistrate Judge would be better positioned to consider the issue after the defendants had answered the Amended Complaint. The Magistrate Judge addressed the motion and concluded, based on the complexity of the legal and factual issues and seriousness of the plaintiff's allegations, that exceptional circumstances warranted the appointment of counsel. *Pro bono* counsel willing to take on the case were identified and entered an appearance on February 2020. Thereafter, the parties conducted discovery, and the present Motion for Summary Judgment was filed on behalf of all remaining and properly served defendants, along with a supporting Memorandum of Law, Statement of Undisputed Material Facts, and substantial evidentiary material. (Doc. Nos. 89, 90, 91, 92.) The plaintiff filed a Response in opposition to the motion and a Response to the Statement of Undisputed Material Facts and his own evidentiary materials. (Doc. Nos. 96, 97, 98.) The defendants have now filed a Reply. (Doc. No. 103.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d

718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III. DISCUSSION

### A. Eighth Amendment Claim

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003); 42 U.S.C. § 1983.

In this case, the second element is not in question. The defendants do not dispute that, as individuals employed by CoreCivic, "a private corporation performing traditional state functions," *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015), they were acting at all relevant times under color of state law. *Accord West v. Atkins*, 487 U.S. 42, 54 (1988) (holding that a physician

employed by a state to provide medical services to state prison inmates acted under color of state law for purposes of § 1983 when undertaking his duties in treating the inmate's injury, as his conduct was "fairly attributable to the State"). The question presented by the defendants' motion is whether the plaintiff can present facts that, if believed by a jury, would establish that the defendants' actions deprived him of some right secured by the Constitution.

The primary constitutional right at issue here is embodied in the Eighth Amendment, which prohibits the infliction of cruel and unusual punishment upon prisoners. In the context of a claim based upon a failure to provide or ensure the provision of medical care to an inmate, the Eighth Amendment bars prison employees from "unnecessarily and wantonly inflicting pain upon [the inmate] through deliberate indifference to his serious medical needs." *Shadrick*, 805 F.3d at 736. An Eighth Amendment claim has both an objective component and a subjective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The objective component requires a plaintiff to prove a "sufficiently serious" medical need, and the subjective component requires a plaintiff to prove that each defendant had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).

A "sufficiently serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (internal quotation marks and citations omitted). If the plaintiff's medical affliction is "seemingly minor or non-obvious," the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Id.* (citations omitted). In addition, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to

constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004).

The subjective component requires the plaintiff to prove that the defendant "had a 'sufficiently culpable state of mind,' equivalent to criminal recklessness." *Santiago*, 734 F.3d at 591 (quoting *Farmer*, 511 U.S. at 834, 839–40). Under this standard, a prison official is deliberately indifferent if he "(1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in fact draw the inference, and (3) then disregarded that risk." *Id.* (internal quotation marks and citations omitted). Because prison officials "do not readily admit the subjective component, a factfinder may infer from circumstantial evidence, including 'the very fact that the risk was obvious,' that a prison official knew of a substantial risk." *Id.* (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009))

### 1. The Objective Component

The defendants argue that Gennoe's Eighth Amendment claim fails, across the board, because the plaintiff has not offered any medical evidence to corroborate his claim that the defendants failed to provide him with adequate medical and mental health treatment for his alleged rectal bleeding and emotional distress, as necessary to establish the objective component of his claim. The court is not persuaded.

Specifically with respect to the plaintiff's claim of rectal bleeding, the defendants assert that the plaintiff offers no medical evidence to establish a causal link between the alleged sexual assault and rectal pain and bleeding.[6] This argument suffers from a tautological problem. As the plaintiff argues, he has no medical proof of his claim of rectal bleeding, because he was denied

---

[6] In his Complaint and deposition, the plaintiff also claimed to suffer from pain upon urination following the assault, but he has not relied on that claim to establish deliberate indifference in response to the defendants' motion.

medical treatment until weeks after the assault and well after the pain and bleeding had stopped. Moreover, the plaintiff's claim that he had suffered a sexual assault that left him in severe pain and suffering from rectal bleeding, standing alone, states a claim of such an obvious need for medical treatment that no medical proof is required to establish the objective component of seriousness. The Sixth Circuit has expressly held that, "where a plaintiff's claims arise from an injury or illness so obvious that even a layperson would easily recognize the necessity for a doctor's attention, the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899–900 (6th Cir. 2004) (interior citation and quotation marks omitted). Instead, the plaintiff need only show that "he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 900. That is what allegedly occurred here, and the absence of medical proof is not fatal to the plaintiff's claim.

Regarding the mental health aspect of the plaintiff's deliberate indifference claim, there is no dispute that "psychological needs may constitute serious medical needs." *Comstock*, 273 F.3d at 703 (citation omitted). The defendants assert that Gennoe cannot satisfy the objective component of a claim related to the deprivation of mental health treatment, because it is "undisputed that Gennoe received . . . a mental health screening with Reed the day after he claims Binkley sexually assaulted him" and that "[t]hese mental health screenings continued over the ensuing months. (Doc. No. 90, at 12 (citing Gennoe Dep. 72; Reed Dep. 83, 86–88, 90–91.[7]) They argue that, because the plaintiff simply disputes the *adequacy* of the treatment he received,

---

[7] Excerpts from Reed's deposition transcript are in the record at Doc. Nos. 92-4 and 96-6.

"medical proof is necessary to assess whether the [alleged] delay caused a serious medical injury." (*Id.* (quoting *Santiago*, 734 F.3d at 591).)

Again, the defendants' argument ignores the conflicting testimony and misconstrues the applicable legal standard. They presumably are relying on caselaw establishing that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (citation omitted))). *Napier*, however, "does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (citing *Napier*, 238 F.3d at 742). "In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury." *Id.*

Here, however, the plaintiff does not simply complain about delay but about the failure to provide care at all in the aftermath of the alleged assault. The Sixth Circuit has expressly recognized that "the psychological trauma from being raped . . . in prison could give rise to a 'substantial risk of serious harm' such that a deliberate refusal to treat a victim could violate the Eighth Amendment." *Lucas v. Chalk*, 785 F. App'x 288, 291–92 (6th Cir. 2019) (quoting *Farmer*, 511 U.S. at 828; citing *Nelson v. Shuffman*, 603 F.3d 439, 448–49 (8th Cir. 2010), as declining summary judgment on a deliberate indifference claim where the doctor had failed to treat a prisoner for "psychological trauma" arising from "violent sexual assault"; and citing 34 U.S.C. § 30301(11) & 14(d) ("Victims of prison rape suffer severe physical and psychological effects[,] . . . [including]

post-traumatic stress disorder, depression, suicide, and the exacerbation of existing mental illnesses.")); *accord Doe v. Scroggy*, No. 5:04-CV-173 (DF), 2006 WL 3022878, at *7 (M.D. Ga. Oct. 23, 2006) ("Sexual assault is clearly a serious injury. Even when a victim of sexual assault does not suffer any physical injury, there is no question that a sexual assault can have a devastating psychological impact on the victim if the victim is not afforded proper psychiatric treatment. Accordingly, the Court finds that the sexual assaults alleged by Plaintiff created an objectively serious psychological need."). The plaintiff here alleges that he reported having suffered a sexual assault and that he repeatedly requested some type of "counseling or mental health treatment" while he was at TTCC from defendant Reed and others and that Reed neither offered nor provided mental health treatment *at all*. (Gennoe Decl. ¶ 9.) He is not merely complaining about the adequacy of the treatment provided but about the lack of treatment.

Although Reed testified that he provided mental health services, and the defendants have presented documentary proof of the monthly (or nearly monthly) assessments he performed, Reed's notes do not suggest that Reed provided counseling related to the alleged sexual assault. The defendants simply do not address the plaintiff's testimony that, when Reed came to his cell door for monthly assessments of how he was dealing with segregation, Reed did not offer counseling. Instead, he offered puzzles. (Gennoe Dep. 88, 104.) The plaintiff claims that, the one time that Gennoe tried to talk to Reed about the rape when Reed was doing his segregation assessment rounds, Reed allegedly told the plaintiff that "he was only there because he was required to be" and that Gennoe did not "even want to know what Dr. Schuch said" about Gennoe's "request for treatment following the rape." (Doc. No. 96-1 ¶ 10.) According to the plaintiff, Reed "refused to discuss [the plaintiff's] request or . . . injuries any further." (*Id.*)

The plaintiff, moreover, has produced medical records showing that, when he finally did obtain treatment after being transferred to a different facility, he was diagnosed with post-traumatic stress disorder and depression that appear to be related, at least in part, to the alleged sexual assault. These records constitute further evidence that Gennoe was suffering from a sufficiently serious mental health need in the aftermath of the alleged rape to satisfy the objective component of his deliberate indifference claim. That is, the later records corroborate Gennoe's claim that he was needlessly suffering from mental distress for which he did not receive treatment while at TTCC, irrespective of whether any delay in treatment caused *additional* damages. *Accord Blackmore*, 390 F.3d at 899 ("Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm."). And, as *Blackmore* also recognized, "the test for deliberate indifference is whether there exists a '*substantial risk* of serious harm' and does not require actual harm to be suffered." *Id.* (quoting *Farmer*, 511 U.S. at 837) (emphasis added by the Sixth Circuit).

In sum, the court finds that there is at least a material factual dispute as to whether the plaintiff's alleged psychological trauma and rectal pain and bleeding constitute mental and medical health needs that were sufficiently obvious to satisfy the objective component of his deliberate indifference claims and for which he received no treatment at all.

2. *The Subjective Component*

To establish personal liability under § 1983 against a defendant, the plaintiff must show that that particular defendant "caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Stated differently, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must [show] that each . . . defendant, through the [defendant's] own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also*

*Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("[A] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." (citations and quotations omitted)). This inquiry is necessarily individualized, meaning that the court must consider what each defendant is alleged to have done and known in order to determine whether the facts, viewed in the light most favorable to the plaintiff, are sufficient to support a jury verdict in favor of the plaintiff as to that defendant.

a)      *Russell Washburn and Yolanda Pittman*

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. That is, "a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). Based on that principle, the Sixth Circuit has frequently reiterated that "a mere failure to act will not suffice to establish supervisory liability." *Id.* (citations omitted). Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Id.* (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). At the same time, the court has acknowledged that "'active' behavior does not mean 'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Id.* at 242. Rather, "'[a]t a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

The defendants argue that the plaintiff seeks to hold Warden Washburn and Assistant Warden Pittman liable solely on the basis that they supervised other defendants who were allegedly deliberately indifferent to the plaintiff's serious medical needs and that the plaintiff has not presented evidence sufficient to show their personal involvement in the events giving rise to his claims. They point to Washburn's testimony that he does not "recall" having any specific conversation with Gennoe about his PREA allegations. (Washburn Dep. 19.[8]) Washburn also claims not to recall having discussions with anyone about the medical treatment that Gennoe received. (Washburn Dep. 21–22.) He assumes, based upon his custom and practice, that he would have spoken with other CoreCivic staff members about the outcome of the investigation into Gennoe's PREA allegation. (Washburn Dep. 19.) As a result of his alleged lack of knowledge and lack of participation in the events giving rise to the plaintiff's deliberate indifference claim, the defendants argue, Washburn "could not possibly have encouraged any CoreCivic employee to withhold medical treatment from Gennoe." (Doc. No. 90, at 9.)

For his part, however, Gennoe testified that he specifically spoke with Washburn about the rape, his need for medical treatment, and the fact that he had not received medical treatment, when Washburn was in his unit. (*See* Gennoe Dep. 92 ("I told him at my door about me not being taken to medical and me needing medical assistance."); *accord* Doc. No. 6, at 8 ("On February 11th, 2019, . . . I stopped Defendant Warden Russell Washburn at my door and advised him of the sexual assault that had taken place on 2-5-19 and the facts that Defendant Roach, and Defendant Garland refused to report the rape to PREA, or have me examined by medical.").)) According to Gennoe, Washburn took a photo of the plaintiff's face sheet by his door and said he would "check into it." (Gennoe Dep. 93.) After that, the plaintiff never heard anything else. Construing this evidence in

---

[8] Excerpts from Washburn's deposition are in the record at Doc. Nos. 92-6 and 96-14.

the light most favorable to the plaintiff, it appears that Washburn was told about the plaintiff's ongoing need for medical attention—and the other defendants' denial of his requests for such treatment—while the plaintiff still needed and had not received medical attention for pain and rectal bleeding. Thus, by stating that he would look into it but then doing nothing, Washburn, arguably at least, "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d at 242. Washburn is not entitled to summary judgment on this part of the claim against him.

The other evidence to which the plaintiff points, however, does not support a claim against Washburn. Specifically, the plaintiff argues that Washburn received, but failed to respond to, the incident report that was forwarded to him by a family advocate. The exhibit to which the plaintiff refers, viewed in its entirety, indicates that the plaintiff had submitted a grievance related to his being denied mental health treatment by Dr. Schuch, to whom he had been referred by Pickett and Reed. The grievance was denied based on the plaintiff's being referred to see "mental health coordinator Mr. Reed" instead and due to his "not meeting the criteria for medication evaluation with psych [illegible] practitioner Schuch." (Doc. No. 96-8, at 3–6.) Assuming that Washburn actually received and reviewed a copy of the grievance forms from the family advocate, nothing about them would have necessarily led Washburn to conclude that the plaintiff had an objectively serious mental health need that was not being met. To the contrary, the response to the grievance indicated that the plaintiff was receiving treatment and that he simply disagreed with that treatment. Although the plaintiff disputes the veracity of that response (specifically as to whether he was receiving treatment), the plaintiff does not show that Washburn had any reason to know that it was false. Moreover, Washburn's failure to respond to this communication is the quintessential post-hoc "mere failure to act [that] will not suffice to establish supervisory liability."

*Peatross*, 818 F.3d at 241. For the same reason, Washburn's failure to respond to TDOC investigator Ramon Sherrell's recommendation that Gennoe be referred for mental health treatment (*see* Sherrell Dep. 37–38[9] and Doc. No. 96-7, at 47), without more, does not give rise to individual liability. Notably, Sherrell's report also indicated his finding that the plaintiff's rape claim was "unsubstantiated." (Doc. No. 96-7, at 47.) The plaintiff has not pointed to evidence sufficient to establish that Washburn subjectively had knowledge that the plaintiff was suffering from an objectively serious need for mental health treatment arising from a sexual assault. Thus, to the extent the plaintiff's claim against Washburn is based on his receiving a copy of the grievances that the plaintiff sent to him and Sherrell's report, Washburn is entitled, in part, to summary judgment in his favor.

As for the claim against Assistant Warden Yolanda Pittman, the defendants also argue that there is no evidence that this defendant "implicitly authorized, approved, or knowingly acquiesced" in the allegedly unconstitutional conduct of other CoreCivic employees. They argue that Pittman's response to Gennoe's February 5, 2019 grievance cannot form the basis of an Eighth Amendment claim against her and that, regardless, once Pittman became aware of Gennoe's grievance, she promptly addressed his concerns. The plaintiff responds that Pittman reviewed Gennoe's inmate grievance, had direct knowledge of his claims, and implicitly "acknowledged his need for mental health treatment when she told him in May 2019 that [he] had been referred to mental health and would be shipped out of [TTCC] at the earliest opportunity." (Doc. No. 97, at 16 (citing Gennoe Decl. ¶ 13).) He argues that Pittman, like Washburn, "indicated that [she] would look into his situation but then took no steps to ensure that he got treatment." (Doc. No. 97, at 17 (citing *Brown v. Hughes*, 894 F.2d 1533, 1539 (11th Cir. 1990) (finding factual dispute for jury

---

[9] Excerpts from Sherrell's deposition are in the record at Doc. Nos. 92-8 and 96-4.

where prison guard "promised to send someone to look at" prisoner's significant foot injury "but never did")).) He also points out that, contrary to Pittman's statement that there was already a PREA complaint in the system, the record establishes that there was no PREA complaint in the system prior to late March 2019, and there are no medical records showing that Gennoe received medical treatment following his rape allegations. He argues that the defendants "cannot claim that Pittman satisfied her obligations by making statements a jury could very well determine were false." (Doc. No. 97, at 17 n.7.)

Pittman testified that, if an inmate made a PREA allegation, she would be made aware of it. (Pittman Dep. 16.[10]) In addition, she was the PREA compliance manager at TTCC, which meant that, "if there was an alleged PREA," it was her job to "make sure that it was documented" and that the "inmate was taken care of." (Pittman Dep. 17.) She confirmed that, after an inmate makes a sexual assault allegation, "the supervisors are responsible for escorting the alleged victim to medical" "immediately." (Pittman Dep. 19–20.) She also acknowledged that she received a grievance from Gennoe related to the alleged assault. (Pittman Dep. 17.)

According to Pittman, when Gennoe filed his "Title VI" grievance against Roach, she denied it because his allegations did not relate to discrimination. She said: "But when he filed the Title VI grievance, as I reviewed the Title VI grievance, there was a PREA filed. So . . . it was not deemed discrimination, based on the fact that the PREA packet was filed." (Pittman Dep. 25 (Doc. No. 96-5).) She claimed that she knew that the PREA packet had been filed, because it was reported to her by mental health, and, "as soon as mental health reported it to [her], [she] filed . . . the PREA." (Pittman Dep. 26.) She also claimed that the PREA was filed prior to the grievance and

---

[10] Excerpts from Pittman's deposition are in the record at Doc. Nos. 92-3 and 96-5.

that she was the person who "put it in the system." (Pittman Dep. 30.) She claimed that Gennoe was "taken over to medical by the mental health staff," and she was "pretty sure" he received a medical examination." (Pittman Dep. 31.)

Most of Pittman's assertions are refuted by the plaintiff and by the documentation in the record. First, it is entirely unclear why the plaintiff's grievance against Roach was characterized as a "Title VI" discrimination complaint, as nothing about it indicates that that was Gennoe's intention. In addition, there is no evidence in the record that a PREA report was filed prior to mid-March 2019, no evidence that Gennoe was "taken over to medical" by the mental health staff at any time, and no evidence that he ever received a medical examination (or mental health treatment) related to his claim that he had been sexually assaulted. Pittman, as PREA coordinator, clearly fell down on the job, as it is apparent that none of the ordinary documentation that she referred to as the PREA packet was compiled in Gennoe's case until after Investigator Charles Moyer conducted his investigation and initiated a PREA report around March 19, 2019. (*See* Doc. No. 92-12.)

As the court already held, however, a violation of the PREA does not give rise to a private cause of action. The question is whether Pittman was deliberately indifferent to the plaintiff's serious medical needs. In that regard, Pittman's testimony suggests that she subjectively believed that a PREA report had been filed and that the plaintiff had received the follow up required by the PREA itself. Again, however, as the plaintiff points out, the only PREA report in the record is the one completed by Investigator Charles Moyer on March 19, 2019. (Doc. No. 92-12.) Thus, there is evidence in the record that would permit a jury to discredit her claim that a PREA report had been filed prior to the plaintiff's February 5, 2019 grievance. However, that grievance itself did not constitute a request for medical attention, mental health treatment, or even for assistance in filing a PREA report. Instead, it simply complains that, on February 5, Sergeant Roach refused to

"contact, or file a P.R.E.A." (Doc. No. 92-13, at 1.) For relief, the plaintiff sought to be separated from Sergeant Roach and to be moved "away from" his assailant. This grievance, on its own, would not have alerted Pittman to the plaintiff's allegedly urgent need for medical or mental health treatment.

Gennoe also testified that he reported the sexual assault to Pittman when she "came to his door," wrote her "in-house mail," and sent her copies of grievances through in-house mail. (Gennoe Dep. 93.) During his deposition, he did not recall the date on which he spoke with her personally, other than to say she came to his door late one night to tell him to stop filing grievances and 5-1Cs and that she was "going to get him shipped out of there." (Gennoe Dep. 93–94.) In his Amended Complaint, however, he alleges that he spoke with her on April 11, 2019. (Doc. No. 6, at 11.) In other words, it is apparent that, by the time he told Pittman that he had been denied treatment, he was complaining to her about other CoreCivic employees' past denials of his requests for such treatment. (*See id.* ("I . . . spoke to her about the rape and everyone's refusal to report it, or to have me properly screened by medical.").)

The facts, as alleged by the plaintiff and construed in the light most favorable to him, are not sufficient to show that Pittman personally was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Nor do the facts as presented by the plaintiff indicate that Pittman "implicitly authorized, approved, or knowingly acquiesced" in the allegedly unconstitutional conduct of other CoreCivic employees, for purposes of a supervisory liability claim. At worst, Pittman abnegated her responsibilities as PREA coordinator, which does not give rise to an Eighth Amendment claim. The court finds, therefore, that Pittman is entitled to summary judgment in her favor.

b)      *Sergeant Scottie Roach*

The entirety of the defendants' argument in support of summary judgment in favor of

defendant Roach on the Eighth Amendment claim is as follows:

> There . . . is no evidence that . . . Roach [was] deliberately indifferent to Gennoe's
> alleged medical needs. . . . The evidence . . . demonstrates that Roach did not deny
> Gennoe the opportunity to report a sexual assault allegation, as there were
> numerous ways for him to report an allegation while housed in segregation,
> including through the use of cordless phones Roach had installed in segregation for
> PREA purposes. . . . . To conclude otherwise would mean that any prison official
> who becomes aware of a sexual assault allegation violates the Constitution if the
> inmate later claims that he did not receive medical or mental health treatment that
> he wanted following the incident.

(Doc. No. 90, at 14–15.) The defendants characterize the plaintiff's claim, again, as "nothing more

than a disagreement with the medical and mental health treatment provided to him following the

alleged sexual assault." (*Id.* at 15.) And finally, the defendants contest the credibility of the

plaintiff's allegations, pointing out that, when the claim finally was investigated, it was deemed

unsubstantiated. In particular, there is evidence in the record indicating that Binkley, the alleged

assailant, was much smaller than Gennoe and that he was taking female hormone medications and

could not maintain an erection at the time of the assault allegation. As a result, Gennoe's sexual

assault allegation was deemed by Investigator Charles Moyer to be "not credible." (Moyer Dep.

47–48.[11])

Indeed, Roach testified that he did not have any recollection of Gennoe's complaining to

him about having been sexually assaulted while he was housed in the segregation unit at TTCC

and specifically denied that Gennoe passed him a note telling him he had been sexually assaulted

or asking him to file a PREA report. (Roach Dep. 21, 34.[12]) He averred that Gennoe, if he had an

---

[11] Excerpts from Moyer's deposition are in the record at Doc. Nos. 92-7 and 96-10.

[12] Excerpts from Roach's deposition are in the record at Doc. Nos. 92-5 and 96-12.

issue like that, would have "just told [him] straight out." (Roach Dep. 34.) Roach also testified that there were multiple ways an inmate could report a sexual assault, including by telephone, telling staff members verbally, or passing them a letter. He claimed that he himself was responsible for the addition of cordless phones to the segregation unit to make it easier for inmates to make a PREA report. He also stated that Gennoe was able to, and actually did, leave his cell every day and would have had access to the telephone. (Roach Dep. 34.) He did not know whether Gennoe did or did not receive medical treatment.

Gennoe, on the other hand, affirmatively averred, as set forth above, that he passed a note to Roach on February 5, 2019, telling Roach that he had been sexually assaulted and asking Roach to bring him the telephone or to make a PREA report himself. (Gennoe Dep. 55, 60.) The note did not describe the incident or say that he needed medical treatment, but Gennoe believed that it should have been obvious that, if he had been sexually assaulted, he needed medical treatment. (*See* Gennoe Dep. 65 ("I said that I had been sexually assaulted, I would assume that that in itself is saying I need medical treatment.").) Later the same day, Gennoe tried to speak to Roach to ask whether he had made the PREA report for him, but Roach simply responded with "an obscene gesture." (Gennoe Dep. 59.)

Gennoe states that he did not see Roach again until three days later, on February 8, 2019. On that day, after the plaintiff had reported the sexual assault to Reed and Pickett, Reed told Roach that Gennoe "needed to be taken directly to medical per Ms. Pickett." (Gennoe Dep. 62.) Roach said "he was doing reclass. He wasn't going to do it and called Captain Garland." (Gennoe Dep. 62.) The plaintiff claims he told Roach he needed to be taken to medical that day and had not showered, but Roach just "walked off." (Gennoe Dep. 62.) In short, the plaintiff told Roach that

he needed medical attention, but Roach refused to take him to medical. (Gennoe Dep. 74.) More specifically, he claims that he was "still bleeding" and "needed to go see a doctor," and he made that assertion to Roach in front of others. (Gennoe Dep. 74.) The plaintiff also claims that he did not leave his cell and was unable to use the telephone in the days following the alleged assault.

The court acknowledges that the plaintiff's evidence is somewhat equivocal. At some points of his testimony, he seems to be saying that he told Roach only that he had been sexually assaulted and, as a result, needed medical attention. The term "sexual assault" covers a wide spectrum of unwanted sexual conduct, not all of it violent or likely to result in physical harm. As a result, the plaintiff's claim that he had not showered and needed a medical examination three days after the alleged assault suggests that he was trying to preserve potential evidence but does not necessarily give rise to an inference that he was injured. Nonetheless, crediting the plaintiff's version of events, a jury could believe that Gennoe told Roach on February 5 that he had been sexually assaulted and then told Roach on February 8 that he was still bleeding from the assault and needed medical attention, but Roach ignored him and walked off without ensuring that someone else would make sure Gennoe received medical attention. On the basis of this allegation, the court finds that a material factual dispute precludes summary judgment in favor of Roach on the plaintiff's Eighth Amendment claim.

### c) Kendras Reed

The defendants argue that Kendras Reed is entitled to summary judgment, because the plaintiff fails to present any evidence showing that Reed acted with deliberate indifference to the plaintiff's serious mental health needs. Instead, they assert that Reed, upon learning of the plaintiff's sexual assault allegation, listened to his concerns and tried to help by escalating the complaint up the chain of command so that an investigation could take place. (Doc. No. 90, at 14.) In addition, the defendants argue that the plaintiff received regular mental health screenings with

Reed, during which Gennoe did not report experiencing any mental health issues. (Reed Dep. 87–90.) They argue that Gennoe's claim "amounts to nothing more than a disagreement with the medical and mental health treatment provided to him following the alleged sexual assault," which is not sufficient to establish a constitutional violation. (Doc. No. 90, at 15.)

Reed, however, acknowledged that inmates who experience a sexual assault need counseling and are typically provided counseling to deal with it. (Reed Dep. 33–34.) He also expressly acknowledged that the cell-door-side assessments are different from actual one-on-one counseling, where he "take[s] somebody out of the cell and provide[s] counseling in [his] office." (Reed Dep. 79–80.) Indeed, Reed testified that he believed that he had provided one-on-one mental health counseling to Gennoe in his office, as distinct from the assessments he performed at the cell door while making his rounds. (Reed Dep. 65.) He also indicated that, if he had performed such counseling, progress notes should have been in Gennoe's medical file for each such session. (Reed Dep. 66.) He did not recall how many times this occurred, however, and there are no progress notes in the record that substantiate his claim that any occurred.

For his part, Gennoe asserts, as a factual matter, that Reed did not actually provide mental health counseling of any kind. Instead, he came around to the unit and distributed puzzles. (*See* Gennoe Dep. 88 ("Q. Okay. And you . . . testified you had . . . spoken with [Reed] several times? A. I testified that he brought me puzzles several times. Q. Did he ever perform a mental health assessment on you? A. Not that I'm aware of."); *id* at 104 ("[A]ll [Reed] would do is come to the door and offer a puzzle through the door.").) Second, the plaintiff alleges that he made multiple verbal requests *to Reed* for mental health care in the days and weeks after the alleged sexual assault, that he filled out multiple sick call requests and was referred by nurses and by Pickett for mental health treatment with Reed in April and May, and that Reed never provided actual treatment. (*See,*

*e.g.*, Doc. No. 96-1 ¶¶ 9–10; Doc. No. 96-7, at 2, 11; Pickett Dep. 21.) Because Reed would not provide him with counseling or treatment, the plaintiff requested that Reed refer him to a doctor for treatment, but he never received mental health treatment from anyone at TTCC. (Doc. No. 96-1 ¶ 11.)

Reed also does not deny that he knew, because the plaintiff reported it directly to him, that the plaintiff claimed to have been sexually assaulted. (*See* Reed Dep. 65.) Under these circumstances, the court finds that a reasonable jury could conclude that Reed knew or should have known that the plaintiff had an objectively serious mental health need and that Reed declined to provide mental health treatment to address that need. As a result, Reed is not entitled to summary judgment.

d)     <em>Sheena Pickett</em>

The plaintiff denies that he ever spoke directly with Pickett, and her personal involvement in the entire incident appears to be limited to talking with Reed on the phone about the plaintiff's allegations on February 8, 2019, then telling Reed to have Roach take Gennoe to medical for an examination, and later referring the plaintiff to Reed for mental health counseling. She testified that, once she makes such a referral, her expectation is that it will be complied with. (Pickett Dep. 22.[13]) The plaintiff states that he would have wanted Pickett to "make sure [he] was taken to medical no matter what, screened, and investigated," as was supposed to have been done following the allegation of a prison rape that implicated the PREA. (Gennoe Dep. 90.) Citing *Darrah v. Krisher*, 865 F.3d 361, 371 (6th Cir. 2017), the plaintiff asserts that a jury could conclude that, because Pickett was responsible for insuring that he receive follow-up treatment after making a

---

[13] Excerpts from Pickett's deposition are in the record at Doc. Nos. 92-2 and 96-3.

PREA report, she acted with deliberate indifference by failing to ensure that Gennoe received that care. (Doc. No. 97, at 17–18.)

In *Darrah*, however, the Sixth Circuit reiterated that it had "previously sustained deliberate-indifference claims holding a defendant liable for abandoning the specific duties of [their] position[s] . . . *in the face of actual knowledge of a breakdown in the proper workings of their respective departments or facilities*, such that this failure resulted in a direct violation of the plaintiff's Eighth Amendment rights." *Darrah*, 865 F.3d at 371 (internal quotation marks and citations omitted) (emphasis added). In this case, the plaintiff does not include any allegations showing that Pickett had actual knowledge of a breakdown in the proper workings of her department.

The facts in the record may be sufficient to show that Pickett did not comply with whatever obligations she had under the PREA to ensure that the alleged incident was properly documented and investigated and that the plaintiff received medical and mental health treatment. However, again, the PREA does not give rise to a private right of action, and violation of the PREA, *per se*, does not constitute a violation of the Eighth Amendment for purposes of a § 1983 claim. The court finds that the plaintiff's allegations, construed as true and viewed in the light most favorable to the plaintiff, do not establish liability on the part of Sheena Pickett under § 1983 based solely on her failure to follow up to make sure that her instructions that the plaintiff be taken for medical and mental health treatment were properly executed. She is entitled to summary judgment in her favor.

### B.  First Amendment Retaliation Claim

Retaliation based upon a prisoner's exercise of his rights under the First Amendment violates the Constitution and may give rise to a claim under 42 U.S.C. § 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to establish a First Amendment retaliation claim, a plaintiff must show that: (1) he was engaged in protected conduct; (2) an

adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) there is a causal connection between the two—that is, that the "protected conduct was a motivating factor behind any harm." *Id.* at 394, 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The Supreme Court has clarified more recently that the "retaliatory motive" "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal citation omitted).

As for the first element, there is no dispute that a prisoner's filing of a non-frivolous grievance constitutes protected activity. *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018). Courts have generally also found that the submission of a non-frivolous PREA complaint is, likewise, protected. *See, e.g.*, *Treadwell v. King*, No. 2:20-CV-10280, 2020 WL 815589, at *2 (E.D. Mich. Feb. 19, 2020); *McKinney v. Napier*, No. 3:17-CV-P28-DJH, 2017 WL 2295905, at *6 (W.D. Ky. May 25, 2017).

Regarding the second, "[a]n adverse action is one that is *capable* of deterring a person of ordinary firmness from exercising the constitutional right in question. *Actual* deterrence need not be shown." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (internal quotation marks and citations omitted) (emphasis in original). Generally, "[w]hether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). While "some adverse actions are so *de minimis* that they do not rise to the level of a constitutionally cognizable injury[,] [t]his threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Maben*, 887 F.3d at 266 (internal quotation

marks and citations omitted). Thus, "unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* (citation omitted).

As for the requisite proof of causation, the Sixth Circuit has explained that, because direct evidence of causation is rare, to demonstrate a genuine dispute of fact as to the third element, "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Thaddeus-X*, 175 F.3d at 399. However, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial." *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (internal quotation marks and citation omitted).

Gennoe contends that Roach retaliated against him for attempting to submit a PREA complaint and for filing a grievance against him for his refusal to allow Gennoe to submit a PREA complaint. Specifically, he asserts that Roach took adverse action against him by (1) repeatedly housing Gennoe in cells close to Binkley's after the rape, thus subjecting Gennoe to verbal harassment and threats by Binkley, despite Gennoe's pleas that he not be placed near Binkley; and (2) directing other officers to turn off the water to Gennoe's cell and withhold meals on "multiple occasions."[14] (Gennoe Decl. ¶ 20.)

The defendants assert that Roach is entitled to summary judgment on this claim. The defendants do not argue that the alleged adverse actions were not sufficiently adverse to satisfy the second element of a retaliation claim. Thus, for purposes of the Motion for Summary Judgment, the court finds that this issue presents a jury question. The defendants argue, instead, that the

---

[14] The plaintiff also asserts that Roach retaliated against him by refusing to report the rape in the first place. Because that failure was the subject of the grievance against Roach and also preceded any actual report of rape, it is impossible for it to have been a retaliatory response to either of those protected actions.

plaintiff cannot establish that Roach was responsible for taking any adverse action against him or that there was a causal connection between the alleged adverse action and the protected activity.

More specifically, they argue that Roach specifically testified that he did not have the ability to review grievances submitted against him and was not aware that Gennoe had submitted any grievances naming him or complaining about his conduct. Roach's testimony, however, does not establish that he would not have been aware that a grievance had been filed against him. Instead, he testified only that he would not have seen the written form of the grievance and that he did not recall a grievance against him. (Roach Dep. 29.) Moreover, as Gennoe points out, the written response to his February 5, 2019 grievance against Roach clearly indicates that Roach was interviewed about the plaintiff's allegations (and denied them), thus giving rise to a permissible inference that Roach was contemporaneously aware of the grievance. (*See* Doc. No. 96-1, at 18 ("Upon interviewing Sgt. Roach . . . , he stated that he offered [Gennoe] the opportunity to file a PREA claim by phone call and inmate refused.").) Moreover, Gennoe's allegations, if true, establish that Roach knew that Gennoe had made or attempted to make a PREA complaint against Binkley. In short, there is a material factual dispute as to whether Roach was aware of the plaintiff's protected activity. And it is undisputed, at least for purposes of the Motion for Summary Judgment, that Roach directed that the plaintiff be housed next to Binkley, who had allegedly sexually assaulted him, despite plaintiff's pleas and in contravention of prison policy.[15] Thus, insofar as the defendants are arguing that the plaintiff cannot prove a causal connection between his protected activity and the adverse action solely because Roach was unaware that Gennoe had engaged in protected activity, the motion fails.

---

[15] Assistant Warden Pittman testified that, after an inmate-on-inmate sexual assault is reported, it is prison policy to separate the alleged perpetrator and alleged victim. (Pittman Dep. 22.)

The defendants also argue that Roach could not recall any instances in which he "or anyone else had to shut off Mr. Gennoe's water or deny him access to a meal" (Roach Dep. 28–29) and that, even assuming the plaintiff suffered meal delays on occasion and had his water shut off, these actions were not "adverse responses to Gennoe's alleged protected activity." (Doc. No. 90, at 20 n.3 (citing Navarette Dep. 19–21[16]).) This argument simply ignores the plaintiff's testimony that Roach himself directed that Gennoe be housed next to Binkley, despite Gennoe's pleas not to be placed near Binkley, and that he heard Roach direct other officers to turn off his water and withhold meals "on multiple occasions." (*See* Gennoe Decl. ¶¶ 17–20.) In addition, while Officer Daisy Navarette's testimony suggests that, if water to a particular cell was shut off, it was to prevent an inmate from flushing contraband, her testimony does not establish that it was ever necessary to cut off the water to the plaintiff's cell for that reason. Instead, Navarette testified that the only time that she recalled in which the plaintiff was "fishing" for drugs, he threw his entire fishing line into the hallway, without pulling any contraband into his cell. (Navarette Dep. 37.) As the plaintiff argues, this action at least arguably obviated any need to shut off the water to Gennoe's cell to prevent him from flushing the contraband. According to Ramon Sherrell's investigative report, Roach recalled one instance in which the delivery of Gennoe's meal was delayed because Gennoe was being combative. (Doc. No. 92-11, at 11.) That recollection is in conflict with Gennoe's testimony that Roach directed that his meal trays be withheld on numerous occasions. Thus, there is a question of fact as to whether Gennoe was deprived of meals and as to whether that deprivation or the cutting off of his water served a legitimate penological objective.

Finally, in their Reply, the defendants also point to the results of Sherrell's investigation, finding no merit to the plaintiff's allegations of retaliation. This court's review of the plaintiff's

---

[16] Excerpts from Navarette's deposition are in the record at Doc. Nos. 92-9 and 96-13.

claims, however is *de novo*. *See Woodford v. Ngo*, 548 U.S. 81, 113 (2006) (Stevens, J., dissenting) ("It is undisputed that prisoners who bring [§ 1983] actions after exhausting their administrative remedies are entitled to *de novo* proceedings in the federal district court without any deference (on issues of law or fact) to any ruling in the administrative grievance proceedings."). Thus, the court is not bound by Sherrell's factual conclusions. Roach is not entitled to summary judgment on the retaliation claim.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendants' Motion for Summary Judgment. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge